| | | |
|---|---|---|
| CBL & ASSOCIATES MANAGEMENT, INC., | ) ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | Case No. 1:05-cv-210 |
| | ) | |
| LUMBERMENS MUTUAL CASUALTY COMPANY and TRAVELERS PROPERTY CASUALTY COMPANY OF AMERICA, | ) ) ) | Judge Mattice |
| | ) | |
| *Defendant*s. | ) | |

## MEMORANDUM AND ORDER

Plaintiff CBL & Associates Management, Inc. ("CBL") brings this action against Defendants Lumbermens Mutual Casualty Company ("Lumbermens") and Travelers Property Casualty Company of America ("Travelers"), alleging that Lumbermens and Travelers breached their respective insurance contracts by refusing to provide a defense in an underlying state court action. In addition to damages resulting from such breaches of contract, Plaintiff seeks a declaration of Defendants' rights and duties under their respective insurance contracts.

Before the Court are Lumbermens' Motion for Judgment on the Pleadings and Travelers' Motion for Judgment on the Pleadings.

For the reasons explained below, Lumbermens' Motion for Judgment on the Pleadings is **GRANTED**, and Travelers' Motion for Judgment on the Pleadings is **GRANTED**.

# I.  STANDARD

The standard of review applicable to a motion for "judgment on the pleadings" pursuant to Federal Rule of Civil Procedure 12(c) is the same as the standard of review applicable under Rule 12(b)(6).  *Grindstaff v. Green*, 133 F.3d 416, 421 (6th Cir. 1998).

Federal Rule of Civil Procedure 12(b)(6) provides for the dismissal of a complaint that fails to state a claim upon which relief can be granted.  The purpose of Rule 12(b)(6) is to permit a defendant to test whether, as a matter of law, the plaintiff is entitled to relief even if everything alleged in the complaint is true.  *Mayer v. Mylod*, 988 F.2d 635, 638 (6th Cir. 1993).  A complaint should not be dismissed for failure to state a claim unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957); *Arrow v. Fed. Reserve Bank*, 358 F.3d 392, 393 (6th Cir. 2004).  The complaint must contain either "direct or inferential allegations respecting all the material elements to sustain a recovery . . . ."  *Scheid v. Fanny Farmer Candy Shops, Inc.*, 859 F.2d 434, 436 (6th Cir. 1988) (internal quotations and citations omitted).  The Court must determine not whether the plaintiff will ultimately prevail but whether the plaintiff is entitled to offer evidence to support his claims.  *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974).  In making this determination, the Court must construe the complaint in the light most favorable to plaintiff and accept as true all well-pleaded factual allegations.  *Arrow*, 358 F.3d at 393; *Mixon v. Ohio*, 193 F.3d 389, 400 (6th Cir. 1999).  The Court need not accept as true mere legal conclusions or unwarranted factual inferences.  *Id.*

## II.    FACTS

Viewing the facts in the light most favorable to Plaintiff and accepting as true all well-pleaded factual allegations[1], the relevant facts are as follows.

CBL operates and manages the Cherryvale Mall (the "Mall") in Rockford, Illinois, which is owned by CBL/Cherryvale I, LLC ("CBL/Cherryvale"). (Court Doc. No. 1, Compl. ¶ 6.) CBL/Cherryvale acquired the Mall on January 31, 2001, and CBL has been managing the Mall since that time. (*Id.* ¶ 7.) At the time CBL/Cherryvale acquired the Mall, space F34 was leased to American Vision Centers, Inc. ("AVC") and subleased to Donald Wight. (*Id.* ¶ 9.) The lease to AVC (the "AVC Lease") was entered into on January 28, 1997, between the then-owner and AVC. (*Id.* ¶ 10.) The sublease to Wight was entered into on February 1, 1997, and incorporated into the AVC Lease. (*Id.*) CBL/Cherryvale assumed the AVC Lease when it purchased the Mall in 2001. (*Id.*)

At the time of the execution of the AVC Lease in 1997, both the then-owner and AVC were aware of a plumbing problem, and the AVC Lease provided that the "LANDLORD agrees to promptly repair the existing plumbing problem at the PREMISES, at LANDLORD's expense, whereby the storm sewer is mistakenly connected to the PREMISES sewer system." (*Id.* ¶ 11; *id.* Ex. A.)

In 2002, Wight vacated space F34. (*Id.* ¶ 13.) On April 10, 2003, CBL/Cherryvale and AVC entered into a Lease Termination Agreement which terminated the AVC Lease.

---

[1]    All written instruments that are exhibits to the complaint are considered part of the complaint for purposes of the Court's consideration of these motions. Fed. R. Civ. P. 10(c). Thus, the AVC Lease and the insurance policies issued by Lumbermens and Travelers, which were included as exhibits to the complaint, are considered part of the complaint. In addition, although Plaintiff did not attach as an exhibit to the complaint in this case Mr. Wight's underlying complaint, such underlying complaint is considered part of the pleadings in this case because it is referred to in Plaintiff's complaint and is central to Plaintiff's claims. *Weiner v. Klais & Co.*, 108 F.3d 86, 89 (6th Cir. 1997).

(*Id.* ¶ 14.) Also on April 10, 2003, CBL/Cherryvale and AVC entered into a Release and Indemnity Agreement which released and discharged AVC from various claims related to the plumbing problems. (*Id.*)

On April 29, 2003, Wight filed an action in the Circuit Court for Winnebago County in Rockford, Illinois. (*Id.* ¶ 16; *see also* Court Doc. No. 1, Notice of Removal Ex. B.) In that action, Wight seeks damages for breach of contract, breach of fiduciary duty, negligence, breach of the covenant of quiet enjoyment, fraud in the inducement, negligent infliction of emotional distress, and negligent misrepresentation against AVC and other defendants, all stemming from the plumbing problem in space F34 that "caused sewage, debris, waste and water to shoot out of the sink drains and flood [space F34] during rainfalls" (Notice of Removal, Ex. B ¶ 11) and AVC's failure to correct the plumbing problem (*id.* ¶ 15). CBL has been providing a defense to AVC in this Illinois litigation. (Compl. ¶ 19.)

Lumbermens and Travelers each issued insurance contracts to CBL for certain periods of time, and CBL claims that these insurance contracts obligate Lumbermens and Travelers to provide a defense to AVC on behalf of CBL in this underlying Illinois litigation. (*Id.* ¶¶ 21, 28, 39, 46.)

Lumbermens issued Policy No. 5AA 059 240-00 to CBL with effective dates from 12/31/2001 to 12/31/2002. (*Id.* ¶ 21; *id.* Ex. B.) Travelers issued Policy No. TJ-GLSA-487D7495-TIL-02 to CBL with effective dates from 12/31/2002 to 12/31/2003. (*Id.* ¶ 39; *id.* Ex. C.) Both policies provide coverage, albeit for different periods of time, for bodily injury and property damage. (*Id.* Exs. B, C.) In order for "bodily injury" and "property damage" to be covered under the policies, such "bodily injury" or "property damage" must have (1) been caused by an "occurrence" that takes place in the "coverage territory" and (2)

-4-

occurred during the policy period.  (*Id.*)  "Bodily injury" is defined under both policies as "bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time."  (*Id.*)  "Property damage" is defined under both policies as "[p]hysical injury to tangible property, including all resulting loss of use of that property" and "[l]oss of use of tangible property that is not physically injured."  (*Id.*)  Both insurance contracts contain a pollution exclusion related to bodily injury and property damage, which provides that bodily injury and property damage "arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of pollutants . . . [a]t or from any premises, site or location which is or was at any time owned or occupied by or rented or loaned to [or managed by[2]], any insured . . . ."  (*Id.*)  In both policies, the term "pollutants" is defined as "any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste."  (*Id.*)

Both policies also provide coverage, albeit for different periods of time, for personal and advertising injury liability.  (*Id.*)  To be covered under the policies, "personal injury" must have been caused by "an offense arising out of your business, excluding advertising, publishing, broadcasting or telecasting done by you or for you."  (*Id.*)  "Advertising injury" under the policies must have been caused by "an offense committed in the course of advertising your goods, products or services."  (*Id.*)  In addition, the offense related to either a personal or advertising injury must have been committed in the "coverage territory" during the policy period.  (*Id.*)  "Personal injury" is defined as follows in both policies:

---

[2]  This portion of the definition ("and managed by") appears only in the Travelers policy.  (Compl. Ex. C.)

injury, other than "bodily injury," arising out of one or more of the following offenses:

> a.      False arrest, detention or imprisonment;
>
> b.      Malicious prosecution;
>
> c.      The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies by or on behalf of its owner, landlord or lessor;
>
> d.      Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services; or
>
> e.      Oral or written publication of material that violates a person's right of privacy.

(*Id.*)  "Advertising injury" is defined as follows in both policies:

> injury arising out of one or more of the following offenses:
>
> a.      Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's good [*sic*], products, or services;
>
> b.      Oral or written publication of material that violates a person's right of privacy;
>
> c.      Misappropriation of advertising ideas or style of doing business; or
>
> d.      Infringement of copyright, title or slogan.

(*Id.*)

The Travelers policy contains a pollution exclusion applicable to the personal and advertising injury liability coverage.  Such exclusion provides that the policy does not provide coverage for personal injury or advertising injury "arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of pollutants at

any time." (*Id.* Ex. C.) "Pollutants" are "any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste." (*Id.*) The Lumbermens policy excludes from the personal and advertising injury liability coverage any personal injury or advertising injury "[f]or which the insured has assumed liability in a contract or agreement." (*Id.* Ex. B.)

## III.   ANALYSIS

Travelers seeks a judgment on the pleadings on two bases: (1) Travelers has no duty to defend AVC because the pollution exclusions in the Travelers insurance policy bar coverage for Wight's alleged damages; and (2) Wight's damages are not covered by the Travelers insurance policy because such damages were a "known loss." Lumbermens seeks a judgment on the pleadings on several bases: (1) Lumbermens is not required to defend AVC on CBL's behalf under the bodily injury and property damage liability coverage of the policy because (a) CBL is not legally obligated to defend or indemnify AVC under the AVC Lease, (b) the policy does not require Lumbermens to pay any amounts arising from CBL's obligations under the release and indemnity agreement, (c) there was no occurrence as defined in the policy, and (d) Lumbermens has no duty to defend AVC because the pollution exclusions in the policy bar coverage for Wight's alleged damages; and (2) Lumbermens is not required to defend AVC on CBL's behalf under the personal and advertising injury liability coverage because CBL is not legally obligated to reimburse AVC for the damages claimed by Wight and, to the extent CBL may be legally obligated, the policy excludes coverage for such damages.

## A.    Jurisdiction over Declaratory Judgment Claims

At the outset, the Court recognizes that, when faced with a declaratory judgment claim, it must determine whether to exercise its discretion to hear such a claim by analyzing the five factors outlined in *Grand Trunk*.    *See* 28 U.S.C. §§ 2201-2202; *Grand Trunk W. R.R. Co. v. Consol. Rail Corp.*, 746 F.2d 323, 326 (6th Cir. 1984).    In this instance, there are claims before the Court other than the declaratory judgment claims: Plaintiff brings two breach of contract claims in addition to its two declaratory judgment claims.    The Court has independent jurisdiction over the breach of contract claims, so even if the Court were to decline to exercise jurisdiction over the declaratory judgment claims, the breach of contract claims would remain before the Court.    *See Snodgrass v. Provident Life & Accident Ins. Co.*, 147 F.3d 1163, 1167-68 (9th Cir. 1998) ("The appropriate inquiry for a district court in a Declaratory Judgment Act case is to determine whether there are any claims in the case that exist independent of any request for purely declaratory relief, that is, claims that would continue to exist if the request for a declaration simply dropped from the case."). Consequently, in the interest of avoiding piecemeal litigation, the Court should entertain the declaratory judgment claims in this action.    *See id.*; *Gov't Employees Ins. Co. v. Dizol*, 133 F.3d 1220, 1225-26 (9th Cir. 1998) ("[W]hen other claims are joined with an action for declaratory relief (e.g., bad faith, breach of contract, breach of fiduciary duty, rescission, or claims for other monetary relief), the district court should not, as a general rule, remand or decline to entertain the claim for declaratory relief."); *Behrens v. Donnelly*, No. Civ. 05-00453 HMS/KS, 2006 WL 897573, at *7-8 (D. Haw. Mar. 31, 2006).

Such result is dictated by an analysis of the *Grand Trunk* factors. In determining whether to entertain jurisdiction over a declaratory judgment action, the Sixth Circuit has directed district courts to consider the following factors:

> (1) whether the declaratory action would settle the controversy; (2) whether the declaratory action would serve a useful purpose in clarifying the legal relations in issue; (3) whether the declaratory remedy is being used merely for the purpose of "procedural fencing" or "to provide an arena for a race for res judicata[";] (4) whether the use of a declaratory action would increase friction between our federal and state courts and improperly encroach upon state jurisdiction; and (5) whether there is an alternative remedy which is better or more effective.

*Grand Trunk*, 746 F.2d at 326. Weighing these factors as a whole, it is apparent that this Court should exercise jurisdiction over Plaintiff's declaratory judgment claims.

Although the Court's determination with respect to these declaratory judgment claims would not settle any issues pending in the underlying state controversy and would not serve a useful purpose in clarifying the legal relations at issue in such state action, *U.S. Fire Ins. Co. v. Albex Aluminum, Inc.*, 161 Fed. App'x 562, 564-65, 2006 WL 41185, at *3 (6th Cir. Jan. 6, 2006) (per curiam), these factors are only part of the analysis. There is no evidence of procedural fencing in this case, so that factor weighs neither in favor of exercising nor in favor of declining jurisdiction.

The final two factors weigh heavily in favor of exercising jurisdiction. First, the retention of jurisdiction over these claims would reduce friction between federal and state courts. If the Court were to decline jurisdiction over the declaratory judgment claims, this Court would be deciding precisely the same issues with respect to the breach of contract claims as a state court would be deciding with respect to the declaratory judgment claims. Such a situation has the potential to increase friction between state and federal courts,

particularly if the courts were to reach different conclusions.  *State Auto. Mut. Ins. Co. v. Turner Funeral Home, Inc.*, No. 1:05-CV-61, 2006 WL 686872, at *5 (E.D. Tenn. Mar. 13, 2006); *Ohio Cas. Ins. Co. v. Kentucky*, No. 4:05CV-085-M, 2005 WL 2656745, at *3 (W.D. Ky. Oct. 17, 2005).  Second, the presence of the breach of contract claims also prevents the Court from concluding that any alternative remedy would be better or more effective. Splitting the claims between this Court and a state court does not create the optimal situation; on the contrary, it exposes the parties to the possibility of inconsistent decisions. *See Ohio Cas. Ins. Co.*, 2005 WL 2656745, at *3.  Because the risk of inconsistent results would be so great if the Court were to decline jurisdiction over the declaratory judgment claims, *see Ohio Cas. Ins. Co.*, 2005 WL 2656745, at *3, the Court concludes that, in this instance, the fourth and fifth factors outweigh the other factors, and this Court must exercise its jurisdiction to hear these claims along with the breach of contract claims.

**B.    Applicable Law**

In cases arising under the Court's diversity jurisdiction under 28 U.S.C. § 1332, the Court must apply the choice of law rules of the state in which the Court sits.  *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941); *Andersons, Inc. v. Consol, Inc.*, 348 F.3d 496, 501 (6th Cir. 2003).  In Tennessee, the law of the place where a contract is made governs the construction and validity of the contract.  *Ohio Cas. Ins. Co. v. Travelers Indem. Co.*, 493 S.W.2d 465, 466 (Tenn. 1973).  In this instance, the insurance contracts at issue were delivered in Tennessee.  Accordingly, the Court will apply Tennessee law to interpret those insurance contracts.

### C.    Duty to Defend

In determining whether Lumbermens and Travelers breached their respective duties to defend, the Court is guided by the principle that an insurer's duty to defend an insured is determined by the allegations in the complaint filed against the insured. *Travelers Indem. Co. of Am. v. Moore & Assocs., Inc.*, No. M2004-01233-COA-R3-CV, 2005 WL 2293009, at *3 (Tenn. Ct. App. Sept. 20, 2005).  "An insurer has a duty to defend when its policy arguably covers the claims raised against the insured."  *Id.*  If the allegations in the underlying complaint leave doubt as to whether the allegations require the insurer to defend, the doubt should be resolved in favor of the insured.  *Id.*

### D.    Pollution Exclusions

Defendants present multiple arguments in support of their respective contentions that their insurance policies do not obligate them to defend AVC on CBL's behalf.  One of those arguments – that the pollution exclusions in their respective policies bar coverage – is common to both Defendants.  Consequently, the Court will address that argument first, before proceeding to the other individual arguments.

Both Defendants contend that the pollution exclusions in their respective policies bar coverage for the damages claimed by Mr. Wight in the underlying state litigation because those damages arise from the intrusion of sewage and waste into space F34.  Specifically, they contend that Mr. Wight's allegation that the plumbing problem "causes sewage, debris, waste and water to shoot out of the sink drains" constitutes the discharge, dispersal, seepage, migration, release, or escape of pollutants.  Travelers contends that the pollution exclusions in its policy bar both bodily injury and property damage coverage and personal and advertising injury liability coverage, while Lumbermens contends only that the pollution

-11-

exclusion in its policy bars bodily injury and property damage coverage. As described above, the language of all three pollution exclusions is nearly identical in all respects. Plaintiff contends that the pollution exclusions do not apply to the damages claimed by Mr. Wight because the exclusions apply only to traditional environmental pollutants and not to sewage and waste. Thus, the key inquiry is whether sewage and waste are encompassed by the term "pollutants."

The Tennessee courts have not yet determined the meaning of the pollution exclusion. In such a situation, this Court must discern from all available sources how the Tennessee courts would decide the issue if confronted with it. *McClain v. Northwest Cmty. Corr. Ctr. Judicial Corr. Bd.*, 440 F.3d 320, 328 (6th Cir. 2006). Thus, the Court will begin its analysis by applying the Tennessee rules of contract interpretation. *See supra* Part III.B.

Under Tennessee law, courts must construe insurance contracts in the same manner as any other contract. *American Justice Ins. Reciprocal v. Hutchison*, 15 S.W.3d 811, 814 (Tenn. 2000). "The language of the policy must be taken and understood in its plain, ordinary and popular sense." *Id.* Where language is susceptible to more than one reasonable interpretation, the language is ambiguous. *Id.* at 815. If such ambiguous language limits the coverage of the insurance policy, that language must be construed in favor of the insured. *Id.* In determining the "plain, ordinary and popular" meaning of language, courts may refer to dictionary definitions. *Id.*

As noted above, the insurance policies at issue define "pollutants" as "any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste." (Compl. Exs. B, C.) The terms "irritant,"

"contaminant," and "waste" are not defined in the respective policies. Thus, the Court will examine the dictionary definitions of those terms.

"Irritant" is defined as "a source of irritation." *American Heritage Dictionary of the English Language* 926 (4th ed. 2000). "Irritation" is defined as "a condition of inflammation, soreness, or irritability of a bodily organ or part." *Id.* "Contaminant" is defined as "one that contaminates." *Id.* at 396. "Contaminate" means "to make impure or unclean by contact or mixture." *Id.* "Waste" means "an unusable or unwanted substance or material, such as a waste product," "garbage; trash," or "the undigested residue of food eliminated from the body; excrement." *Id.* at 1942.

In the underlying complaint, Mr. Wight describes his damages as being caused by "sewage, debris, waste and water [shooting] out of the sink drains and [flooding space F34]." (Notice of Removal Ex. B ¶ 11.) He also describes such sewage, debris, waste, and water as "unsanitary" (*id.* ¶ 12), as causing space F34 to become "contaminated" (*id.* ¶ 16), and as creating "hazardous and unsafe" (*id.* ¶ 17) and "dangerous" (*id.* ¶ 22) conditions in space F34.

In the context of these allegations in the underlying complaint, the Court concludes that the pollution exclusion is unambiguous and excludes from coverage the damages claimed by Mr. Wight. While the materials present in space F34 do not fall under the definition of "irritant," it is clear that they do fall under the definitions of both "contaminant" and "waste." First, the materials at issue are "contaminants" because they clearly make space 34 impure or unclean. Mr. Wight alleges in his complaint that such materials "contaminated" the space and made it "unsanitary." Such allegations fit square within the definition of "contaminant." Second, the materials at issue are clearly "waste," as the

-13-

definition of waste specifically includes sewage and also includes debris, which could be characterized either as garbage or trash or as an unusable or unwanted substance or material. In sum, the plain, ordinary meaning of the pollution exclusion leads to the conclusion that it applies to the damages caused by the materials named in Mr. Wight's complaint.

The Court is aware that there are two distinct lines of cases interpreting the pollution exclusion – one line supporting Plaintiff's argument and one line supporting Defendants' argument. In the first line of cases, the pollution exclusion clause is found, based on the original purposes behind the inclusion of such clause in insurance policies and the use of terms of art from environmental law, to be applicable only to traditional environmental pollutants. *See, e.g.*, *Nautilus Ins. Co. v. Jabar*, 188 F.3d 27, 30-31 (1st Cir. 1999) (Maine law); *Enron Oil Trading & Transp. Co. v. Walbrook Ins. Co.*, 132 F.3d 526, 530-31 (9th Cir. 1997) (Montana law); *Stoney Run Co. v. Prudential-LMI Commercial Ins. Co.*, 47 F.3d 34, 38 (2d Cir. 1995) (New York law); *Regional Bank of Colo., N.A. v. St. Paul Fire & Marine Ins. Co.*, 35 F.3d 494, 498 (10th Cir. 1994) (Colorado law); *Lumbermens Mut. Cas. Co. v. S-W Indus., Inc.*, 23 F.3d 970, 981-82 (6th Cir. 1994) (Ohio law); *Pipefitters Welfare Educ. Fund v. Westchester Fire Ins. Co.*, 976 F.2d 1037, 1043-44 (7th Cir. 1992) (Illinois law); *C.H. Heist Caribe Corp. v. Am. Home Assurance Co.*, 640 F.2d 479, 482-83 (3d Cir. 1981) (Virgin Islands law); *Westchester Fire Ins. Co. v. City of Pittsburg*, 794 F. Supp. 353, 355 (D. Kan. 1992) (Kansas law); *Minerva Enters., Inc. v. Bituminous Cas. Corp.*, 851 S.W.2d 403, 404 (Ark. 1993); *MacKinnon v. Truck Ins. Exch.*, 71 P.3d 1205, 1216-17 (Cal. 2003); *Am. States Ins. Co. v. Koloms*, 687 N.E.2d 72, 489, 494 (Ill. 1997); *Thompson v. Temple*, 580 So. 2d 1133, 1135 (La. Ct. App. 1991); *Western Alliance Ins. Co. v. Gill*, 686 N.E.2d

997, 999 (Mass. 1997); *West Am. Ins. Co. v. Tufco Flooring E., Inc.*, 409 S.E.2d 692, 699-700 (N.C. Ct. App. 1991).

In the second line of cases, the pollution exclusion clause is found to be applicable to all types of pollution that fall under the letter of the clause, not just traditional environmental pollutants. *See, e.g.*, *U.S. Fire Ins. Co. v. City of Warren*, 87 Fed. App'x 485, 490 (6th Cir. 2003) (Michigan law); *Assicurazioni Generali, S.p.A. v. Neil*, 160 F.3d 997, 1004-06 (4th Cir. 1998) (Maryland law); *Reliance Ins. Co. v. Moessner*, 121 F.3d 895, 900-02 (3d Cir. 1997) (Pennsylvania law); *Certain Underwriters at Lloyd's London v. C.A. Turner Constr. Co.*, 112 F.3d 184, 188 (5th Cir. 1997) (Texas law); *American States Ins. Co. v. Nethery*, 79 F.3d 473, 477 (5th Cir. 1996) (Mississippi law); *Longaberger Co. v. U.S. Fidelity & Guar. Co.*, 31 F. Supp. 2d 595, 603-04 (S.D. Ohio 1998) (Ohio law); *Deni Assocs. of Fla., Inc. v. State Farm Fire & Cas. Ins. Co.*, 711 So. 2d 1135, 1138 (Fla. 1998); *Auto-Owners Ins. Co. v. Hanson*, 588 N.W.2d 777, 779-81 (Minn. Ct. App. 1999); *Cook v. Evanson*, 920 P.2d 1223, 1226 (Wash. Ct. App. 1996); *Peace ex rel. Lerner v. Northwestern Nat'l Ins. Co.*, 596 N.W.2d 429,  (Wis. 1999).

Plaintiff urges the Court to adopt the reasoning of the first line of cases and conclude that the pollution exclusion applies only to traditional environmental pollutants.  The Court concludes, however, that Tennessee courts, if faced with this issue, would adopt the reasoning of the second line of cases and would conclude that the pollution exclusion applies to all types of pollution, including sewage, and not just to traditional environmental

pollutants.  This result is in accordance with and dictated by the Tennessee rules of construction for interpreting insurance policies.[3]

The conclusion reached in the first line of cases is "premised on a technical rather than an ordinary reading of the exclusion, ascribing to the reader a knowledge of 'terms of art' in environmental law . . . ."  *Auto-Owners Ins. Co.*, 588 N.W.2d at 779.  Such a technical reading of the exclusion is not in accord with the rules of construction in Tennessee, which require the Court to determine the "plain, ordinary and popular meaning" of the language at issue.  Although there is evidence that the exclusion was originally inserted into insurance policies with the intent that it apply to traditional environmental pollutants, *see, e.g.*, *Koloms*, 687 N.E.2d at 79-82, the Court may not consider such evidence when it has concluded that the exclusion is unambiguous, as the Court has done in this instance.  *See also McKusick v. Travelers Indem. Co.*, 632 N.W.2d 525, 531 (Mich. Ct. App. 2001) ("Although we recognize that other jurisdictions have considered the terms "discharge," "dispersal," "release," and "escape" to be environmental terms of art, thus requiring the pollutant to cause traditional environmental pollution before the exclusion is applicable, we cannot judicially engraft such limitation.  This Court must enforce the insurance policy in accordance with its terms as interpreted in light of their commonly used, ordinary, and plain meaning.").

---

[3]     The Court is aware that, when a novel or unsettled question of state law arises, it is within the Court's discretion to *sua sponte* certify such question to the highest court of the state.  *Elkins v. Moreno*, 435 U.S. 647, 662 *Lehman Bros. v. Schein*, 416 U.S. 386, 391 (1974); *Transamerica Ins. Co. v. Duro Bag Mfg. Co.*, 50 F.3d 370, 372 (6th Cir. 1995).  In the case at bar, the Tennessee courts have not yet addressed the precise question at issue.  Tennessee does, however, have well-established principles that govern the interpretation of insurance contracts.  *See Transamerica Ins. Co.*, 50 F.3d at 372.  Accordingly, the Court relies on such principles to interpret the exclusion at issue, and the Court declines to certify the question of the meaning of the exclusion to the Tennessee Supreme Court.

Thus, because the Court finds that the pollution exclusion unambiguously applies to sewage and the other materials named in the underlying complaint in this action, the Court concludes that Lumbermens and Travelers have no duty to defend AVC on behalf of CBL in the underlying litigation with respect to any coverages to which the exclusion applies. The Court need not address Defendants' other arguments regarding the relevant coverages.

Accordingly, Travelers' Motion for Judgment on the Pleadings is **GRANTED**, and Plaintiff's causes of action against Travelers for breach of contract and seeking a declaratory judgment are **DISMISSED WITH PREJUDICE**. Lumbermens' Motion for Judgment on the Pleadings is **GRANTED** with respect to Plaintiff's causes of action against Lumbermens for breach of contract and seeking a declaratory judgment relative to the bodily injury and property damage coverage, and such causes of action are **DISMISSED WITH PREJUDICE**. What remains are Plaintiff's causes of action against Lumbermens for breach of contract and seeking a declaratory judgment relative to the personal and advertising injury liability coverage, to which the pollution exclusion does not apply.

### E. Lumbermens' Personal and Advertising Injury Liability Coverage

Lumbermens contends that it is not required to defend AVC on CBL's behalf in the underlying litigation with respect to the personal and advertising injury liability coverage in the Lumbermens policy because (1) AVC waived its right to defense or indemnity by CBL when it entered into the AVC Lease, which specifically waives all claims AVC may have against CBL as a result of water coming into space F34, flooding, or the failure of the plumbing or sewer system, and (2) to the extent AVC did not waive its right to defense or

-17-

indemnity as to all claims, CBL's assumption of liability relative to those particular claims excludes those claims from coverage. CBL contends that it is legally obligated by the AVC Lease to provide defense and indemnity to AVC for damages arising from CBL's failure to make certain repairs to space F34 and that, therefore, Lumbermens is required to provide such defense.

The Lumbermens policy requires Lumbermens to "pay those sums that the insured becomes legally obligated to pay as damages because of 'personal injury' or 'advertising injury' . . . . [Lumbermens] will have the right and duty to defend any 'suit' seeking those damages." (Compl. Ex. B.) As noted above, "personal injury" includes injury arising out of, *inter alia*, wrongful eviction. (*Id.*) The underlying complaint in this matter alleges a cause of action against AVC for breach of the covenant of quiet enjoyment, which brings the injuries arising therefrom within the definition of "personal injury." (Compl. ¶¶ 56-68.) The question, then, is whether the damages arising from Mr. Wight's "personal injury" are covered by the insurance policy.

Central to this inquiry are two sections of the AVC Lease. Article 9, Section 5 of the lease reads as follows:

> LANDLORD [CBL] shall not be responsible or liable for and TENANT [AVC] hereby expressly waives all claims against LANDLORD for injury to persons or damage to TENANT's property resulting from (i) water, snow or ice being upon or coming through the roof, walls, windows or otherwise; (ii) wind, water or flooding; (iii) any act, omission or negligence of co-tenants or other persons or occupants of the Shopping Center; (iv) the acts of any owners or occupants of adjoining or contiguous property; or (v) failure of the electrical system, the heating or air conditioning systems, or the plumbing and sewer systems. LANDLORD shall not be liable for any damage occasioned by its failure to keep the PREMISES in repair unless LANDLORD is obligated to make such repairs under the terms hereof, notice of the

> need for such repairs has been given LANDLORD, a reasonable time
> has elapsed and LANDLORD has failed to make such repairs.

(Compl. Ex. A art. 9, § 5.)  Article 10, Section 1 of the AVC Lease reads, in pertinent part, as follows:

> LANDLORD agrees to promptly repair the existing plumbing problem
> at the PREMISES, at LANDLORD's expense, whereby the storm
> sewer is mistakenly connected to the PREMISES sewer system.

(Compl. Ex. A art. 10, § 1.)

Lumbermens contends that the waiver in Article 9, Section 5 by AVC of all claims against CBL for damages resulting from water, flooding, or the failure of the plumbing or sewer systems negates any legal obligation by CBL to defend or indemnify AVC.  Since the personal injury coverage only applies to damages that CBL is legally obligated to pay, Lumbermens argues that the waiver bars coverage for any damages suffered by Mr. Wight as a result of the flooding of space F34 and the failure of the plumbing system.

CBL argues in response that an analysis of Article 5, Section 9 of the AVC Lease to determine CBL's legal obligation is incomplete without referencing Article 10, Section 1. CBL points out that Article 5, Section 9 relieves CBL of legal liability with respect to damages resulting from CBL's failure to repair, *unless* CBL undertook an obligation to repair elsewhere in the AVC Lease.  CBL argues that Article 10, Section1 represents just such an undertaking.  Thus, CBL asserts that it is legally obligated with respect to the damages claimed by Mr. Wight, which he alleges were caused by the failure to repair the plumbing system.  Lumbermens does not appear to contest this conclusion.

Taking Article 9, Section 5 and Article 10, Section 1 together, it is clear that, if CBL is liable for any damages claimed by Mr. Wight, such liability could only stem from the

CBL's agreement to repair the plumbing system because without such agreement to repair, such damages would fall under the main waiver provision. Thus, the Court assumes for the purpose of the remainder of its analysis that CBL, as a result of the agreement to repair in Article 10, Section 1, is legally obligated with respect to the damages claimed by Mr. Wight.

Lumbermens contends that, even if CBL is obligated under Article 10, Section 1 of the lease, the Lumbermens policy excludes coverage for such obligations. As support for this contention, Lumbermens points to the assumed-liability exclusion under the personal and advertising injury liability coverage, which bars coverage for personal injury "[f]or which the insured has assumed liability in a contract or agreement." (Compl. Ex. B.) As explained above, it is clear from the record that CBL did assume liability in the AVC Lease for its failure to repair. CBL even appears to acknowledge its assumption of liability, arguing in its brief that "[w]hen CBL assumed the obligations under the Lease with AVC . . . , it assumed **all obligations** of the Lease including . . . liability to AVC for its alleged failure to repair the plumbing problems." Thus, under the first sentence of the assumed-liability exclusion, the damages claimed by Mr. Wight are excluded from coverage because CBL's liability with respect to those damages stems was assumed in a contract or agreement.

In their briefs, neither party addressed the second sentence of the assumed-liability exclusion, which states that the exclusion "does not apply to liability for damages that the insured would have in the absence of the contract or agreement." (Compl. Ex. B.) Thus, under the assumed-liability exclusion, although the insured may have assumed certain liabilities in a contract, the insured will still receive coverage under the insurance policy if

-20-

the insured would have been liable even in the absence of the contract.  In this instance, this exception to the assumed-liability exclusion requires the Court to determine whether CBL would have been liable for the damages resulting from the failure to repair the plumbing system, even in the absence of the provision in the AVC Lease obligating CBL to repair the system.

Tennessee has indicated its adoption of the principles stated in the Restatement of Torts regarding the obligations of landlords and tenants.  *See, e.g.*, *Denton v. Hahn*, No. M2003-00342-COA-R3-CV, 2004 WL 2083711, at *4 (Tenn. Ct. App. Sept. 16, 2004).  The relevant section of the Restatement provides that a landlord is not liable to a tenant or to others on the premises for injuries caused by dangerous conditions that existed when the tenant took possession. *Restatement (Second) of Torts* § 356 (1965).  Several exceptions to this general rule exist: (1) when the landlord contracts to repair the dangerous condition (*id.* § 357); (2) when the landlord does not disclose the existence of a dangerous condition to the tenant (*id.* § 358); (3) when the premises is leased for a purpose involving public admission, in which case the landlord is liable for injuries caused to persons who enter the premises for that purpose (*id.* § 359); (4) when the landlord retains control over a portion of the premises used by the tenant (*id.* § 360); (5) when the landlord retains control over a portion of the premises that is necessary to safely use of the other portion of the premises (*id.* § 361); and (6) when the landlord is negligent in making repairs and the land is made more dangerous or given a deceptive appearance of safety (*id.* § 362).

As discussed above, the exception related to a landlord's contract to repair is at issue in this case.  The remainder of the exceptions, however, are not at issue.  First, this is not a situation in which the landlord failed to disclose a dangerous condition to the tenant.

-21-

In this instance, all parties knew about the problems with the plumbing system. Second, although the premises may have been leased for a purpose involving public admission, the injuries at issue are not those of persons who entered the premises for that purpose. Third, there is no evidence that the landlord retained control over any portion of the premises – either a portion of the premises used by the tenant or necessary for the safe use of the tenant's portion of the premises. Fourth, there is no allegation that the premises were made more dangerous by the landlord's failure to repair the plumbing system; on the contrary, the same conditions existed both before and after the promise to repair. Thus, the only exception to the general rule at issue in this case is the contract to repair.

Consequently, CBL is liable for the damages at issue only as a result of its agreement to repair in Article 10, Section 1 of the AVC Lease, without which the damages at issue would have fallen under the main waiver provision of the AVC Lease. Because CBL is liable for damages resulting from its failure to repair only as a result of its assumption of liability in the AVC Lease, such damages are excluded from coverage under the assumed-liability exclusion. While CBL may be liable to AVC and/or Mr. Wight for any damages stemming from its failure to repair the plumbing system, the Lumbermens policy does not provide coverage to CBL for those damages.

Accordingly, Lumbermens' Motion for Judgment on the Pleadings is **GRANTED** with respect to Plaintiff's causes of action against Lumbermens for breach of contract and seeking a declaratory judgment relative to the personal and advertising injury liability coverage, and such causes of action are **DISMISSED WITH PREJUDICE**.

**IV. CONCLUSION**

For the reasons stated above, Travelers' Motion for Judgment on the Pleadings [Court Doc. No. 25] is **GRANTED**, and Plaintiff's causes of action for breach of contract and seeking a declaratory judgment against Travelers are **DISMISSED WITH PREJUDICE**. Lumbermens' Motion for Judgment on the Pleadings [Court Doc. No. 39] is **GRANTED**, and Plaintiff's causes of action for breach of contract and seeking a declaratory judgment against Lumbermens are **DISMISSED WITH PREJUDICE**.

In accordance with Federal Rule of Civil Procedure 54(d)(1), Defendants are entitled to recover their costs of this action.

The Clerk is directed to close the file in this case.

SO ORDERED this 25th day of July, 2006.


_____*s/ Harry S. Mattice, Jr.*_____
HARRY S. MATTICE, JR.
UNITED STATES DISTRICT JUDGE